# EXHIBIT A

Folding Light v. Bunny Foo Foo Labs, LLC; 1:19-cv-0349

Response in Opposition to Motion to Dissolve Folding Light
and Appoint Liquidating Agent

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE JAMES STREIBICH REVOCABLE TRUST OF 2002, an Illinois Trust, individually, and derivatively, on behalf of FOLDING LIGHT, LLC, a Delaware Limited Liability Company, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 20 CV 2242 |
| BROCK H. FLAGSTAD, an individual; OXFORD MARKETING PARTNERS, LLC, a Delaware Limited Liability Company; OXFORD MEDIA, LLC, an Illinois Limited Liability Company; OXFORD TAX PARTNERS, LLC, an Illinois Limited Liability Company; OXFORD FG, LLC, an Illinois Limited Liability Company; OXFORD GP, LLC, an Illinois Limited Liability Company; FINANCIAL FREEDOM ADVISORS, LLC, an Illinois Limited Liability Company; and CLOVERPOINT PARTNERS, LLC, an Illinois Limited Liability Company; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Judge Manish S. Shah<br><br>*Provisionally Filed Under Seal* |
| Defendants. | ) ) | |

**AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES,**
**AND APPOINTMENT OF A RECEIVER**

Plaintiff, THE JAMES STREIBICH REVOCABLE TRUST OF 2002, an Illinois Trust, individually ("the Trust"), and derivatively, on behalf of FOLDING LIGHT, LLC, a Delaware Limited Liability Company ("Folding Light") (hereinafter collectively "the Plaintiffs"), by its attorneys, Sheppard, Mullin, Richter & Hampton, LLP, for its Amended Complaint for Injunctive Relief, Damages and Appointment of a Receiver, against the Defendants BROCK H. FLAGSTAD ("Flagstad"), OXFORD MARKETING PARTNERS, LLC ("Oxford Marketing"), OXFORD MEDIA, LLC ("Oxford Media"), OXFORD TAX PARTNERS, LLC ("Oxford Tax"), OXFORD FG, LLC ("Oxford FG"), OXFORD GP, LLC ("Oxford GP") (hereinafter collectively

referred to herein as "Oxford"), FINANCIAL FREEDOM ADVISORS, LLC ("FFA"); and CLOVERPOINT PARTNERS, LLC ("Cloverpoint") (collectively, "the Defendants"), allege as follows:

## NATURE OF THE CASE

1.     This action arises out of a scheme to defraud the Trust of over $2,000,000 by inducing the Trust to invest in Folding Light to provide it with trading capital for crypto currency and securities trading.  In order to secure the monies from the Trust, Flagstad falsely represented that an investment from the Trust would be used as trading capital for Folding Light's E-mini futures, U.S. Treasury and crypto currency trades.  Flagstad represented engaging in "live" trading was critical to Folding Light's ability to demonstrate that its proprietary trading platform was viable and would generate actual returns.  Without active trading, Folding Light would not be able to attract significant additional outside capital to build the business.  However, with active trading, Flagstad represented it would be able to attain significant growth and returns. The Trust, based upon Flagstad's representations, invested $2,000,000 into Folding Light.   The Defendants, at Flagstad's direction, however, ended up transferring trading capital the Trust invested with Folding Light to the Defendants' bank accounts.  The Trust brings this action individually, and derivatively on behalf of Folding Light, both of whom have been irreparably damaged as a result of the Defendants' unlawful conduct for violations of Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count I), Conspiracy to Violate Section 1962(c) of RICO, 18 U.S.C. § 1962(d) (Count II), Common Law Fraud (Count III), Conversion/Theft (Count IV), Breach of Fiduciary Duty (Count V), Breach of Contract (Count VI), Civil Conspiracy (VII), and for an Accounting (VIII).

## PARTIES

2.     Plaintiff The James Streibich Revocable Trust of 2002, ("the Trust") is an Illinois Trust, with its principal office located in Chicago, Illinois.  The Trust maintains a membership interest in Folding Light.

3.     Plaintiff Folding Light, LLC, ("Folding Light") is a Delaware Limited Liability Company, with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.

4.     Defendant Brock Flagstad ("Flagstad") is an individual domiciled in Sea Island, Georgia.  Flagstad maintains a membership in Folding Light and acts as its Lead Manager.

5.     Defendant Oxford Marketing Partners, LLC ("Oxford Marketing") is a limited liability company organized under the laws of the state of Delaware with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Oxford Marketing Partners, LLC.

6.     Oxford Media Group, LLC ("Oxford Media") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Oxford Media, LLC.

7.     Oxford Tax Partners, LLC ("Oxford Tax") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Oxford Tax Partners, LLC.

8.     Oxford FG, LLC ("Oxford FG") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Oxford FG, LLC.

9.     Oxford GP, LLC ("Oxford GP") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Oxford GP, LLC.

10.     Financial Freedom Advisors, LLC ("FFA") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Financial Freedom Advisors, LLC.

11.     Cloverpoint Partners, LLC ("Cloverpoint") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Cloverpoint Partners, LLC.

## JURISDICTION AND VENUE

12.     Original jurisdiction over this matter exists pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  The Court also has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367.

13.     Venue of this action is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

14.     Flagstad has started numerous limited liability companies ("Flagstad Companies") in Chicago – most, if not all, of which are located at the same address of 215 West Ohio Street. Flagstad Companies also share the same accountant and law firm for advisory services.

15.     Flagstad has solicited millions of dollars in private equity funds for Flagstad Companies from numerous prominent Chicago-area investors.  Flagstad's common business

model is to start a company that purportedly develops a revenue stream through the collection and/or sale of data. Flagstad Companies include a variety of industry sectors, including healthcare and tax. Once formed, Flagstad then seeks out millions of dollars in investment capital with the promise of rapid growth and above market returns to investors. Flagstad's Companies all take the form of either Delaware or Illinois limited liability companies.

16. The web of Flagstad Companies include:

- Folding Light, LLC (SOS File No. 06762271)

- Folding Light, LLC (SOS File No. 07037198)

- Folding Light BC, LLC (SOS File No. 07036809)

- Folding Light, FX LLC (SOS File No. 07036787)

- Oxford Marketing Partners, LLC (SOS File No. 07036418)

- Oxford Media Group, LLC (SOS File No. 07389493)

- Oxford Tax Partners, LLC (SOS File No. 05327865)

- Oxford FG, LLC (SOS File No. 07389566)

- Oxford GP, LLC (SOS File No. 07956983)

- Financial Freedom Advisors (SOS File No. 04225376)

- In Parallel, LLC (SOS File No. 03399729)

- Two Screens Media, LLC (SOS File No. 05132436)

- Press Media Group, LLC (SOS File No. 05902665)

- Channel Clarity Holdings, LLC (SOS File No. 04164334)

- Channel Clarity Holdings, Inc. (SOS File No. 64272624)

- Brookside Capital, LLC (SOS File No. 07046855)

- Cloverpoint Partners, LLC (SOS File No. 04225414)

17. On or about May 2018, Flagstad approached the Trust through its Trustee James Streibich ("Streibich") to solicit an investment in Folding Light. Flagstad represented that Folding Light had developed a proprietary financial trading platform to trade securities and bitcoin and other crypto-based currencies. Flagstad represented that Folding Light's proprietary trading platform for block chain currency trading was unique in the Financial Technology industry. He further represented to the Trust that Folding Light was looking for trading capital in order to activate its trading strategies. With trading capital, it could validate its business model and build Folding Light into a significant market participant. Flagstad represented that trading platform "back testing" had demonstrated significant financial returns. And, with the trading capital from the Trust, Folding Light could demonstrate actual returns which would allow it to: 1) attract significant additional outside private equity investment, and 2) be able to leverage the trading capital at multiple times its value.

18. Flagstad represented and warranted to the Trust that, in exchange for an investment of $2,000,000 to be used for trading capital, the Trust would acquire a preferred interest in Folding Light. Flagstad further represented and warranted that the Trust funds received would be used only for Folding Light trading capital. This was confirmed by Flagstad during a January 29, 2020 conference call with Streibich, and attorney Stan Sneeringer. Flagstad and Sneeringer explained that a promissory note would be established between the Trust and Folding Light.

19. Streibich told Flagstad that the Trust was interested in investing in Folding Light to provide trading capital in response to Flagstad's representations. Flagstad reaffirmed his promise that the Trust's funds would only be used for trading capital – not to fund Folding Light business expenses – and that business expenses were the responsibility of Flagstad and Folding

Light Member, Kasey Klaas.  In May 2018, the Trust, in reliance upon Flagstad's representations and warranties, invested $2,000,000 into Folding Light.  In exchange, the Trust received a membership interest in the form of preferred capital in Folding Light.

20.     Only a matter of weeks after the Trust's investment, Folding Light, at Flagstad's direction, began transferring money from Folding Light's bank account to Flagstad and Defendant FFA.  Between June 1 and July 24, 2018, $340,000 of Folding Light cash was transferred to Flagstad and FFA.  In the Fall of 2018, the Folding Light trading team and other members departed to start a competing trading company.  Folding Light thereafter filed suit against former Folding Light Members and employees, including Kasey Klaas, in the United States District Court for the Northern District of Illinois. *See* Folding Light, LLC v. Kasey Klaas, et al., Case No. 1:19-cv-03949 (N.D. Ill. filed June 12, 2019).  The Defendants responded with counterclaims against Flagstad for conversion and breach of fiduciary duty.  The counterclaims allege that Flagstad converted over $340,000 from Folding Light and transferred the funds to Flagstad Company FFA.

21.     Upon learning of the counterclaim against Flagstad, the Trust inquired of the claim.  Flagstad denied converting funds and represented that the counter claimants did not understand accounting.  With financial trading on hold due to the abrupt departure of Folding Light's trading team and funds in Folding's Light's account, Flagstad approached Streibich regarding establishing a Revolving Credit Line of $200,000 between Folding Light and Defendant Oxford Marketing.  Streibich agreed to this loan to Oxford Marketing as long as Oxford Marketing made interest payments on a monthly basis to Folding Light.  Oxford Marketing made the first four interest payments and then stopped.

22.     In the summer of 2019, Flagstad moved his residence from Chicago to Sea Island, Georgia.  Defendants have made payments for Flagstad's home in Sea Island, Georgia. Folding Light was no longer operational and remained embroiled in a dispute with its former trading team and Folding Light Members.  With Flagstad's move to Georgia, the Trust was finding it difficult to receive information from him regarding Folding Light's finances.  Flagstad became increasing unavailable to discuss Folding Light and repeatedly ignored the Trust's requests for updated Company reports regarding its financial affairs.

23.     Flagstad has a rapacious personal need for cash to support his lavish lifestyle of private jets and expensive cars.  His cash needs exceeded any compensation he received from Folding Light.

24.     The Defendants, individually and collectively, are engaged in a common enterprise (the "Enterprise") to engage in financial fraud to enrich Flagstad.   The Enterprise has been ongoing for at least three years beginning in 2017, and is continuing.

25.     Flagstad has received at least $1.5 million in cash payments between January 2019 and August 2020 from the Enterprise.

26.     Defendants have created phony invoices and/or expense records to substantiate the hundreds of thousands of dollars transferred from Folding Light to Oxford Media, FFA, and the other Defendants.

27.     Since Flagstad retains complete control over Folding Light's books and records, the Trust has little to no understanding of the Company's financial affairs.  And despite the Trust's repeated requests to review Folding Light's books and records, Folding Light has refused to produce them and/or to provide an accounting of the use of Folding Light assets.

28.    In late 2019, the Trust persisted in seeking financial information regarding Folding Light, without success.  With Flagstad's failures to communicate to the Trust, its concern and suspicion increased.  As a result, in February 2020 Streibich decided to go directly to one bank where he knew Folding Light maintained an account.  He was able to obtain partial banking information that startingly revealed that Flagstad—beginning as early as January 2019 and without notifying Folding Light Members, notifying the management committee, providing collateral, or requesting the Trust's consent for a related party transaction as was done just one month prior for the Revolving Line of Credit Line—directed at least $849,000 in unauthorized secret cash wire transfers from Folding Light to bank accounts and to the Defendants.

29.    The partial bank records that were recovered reveal Flagstad's illegal cash wire transfers from Folding Light in the following stunning amounts:

| Date | Account | Amount ($) |
| --- | --- | --- |
| 06-04-19 | 4494 | 50,000 |
| 06-05-19 | 4494 | 25,000 |
| 06-14-19 | 4494 | 125,000 |
| 06-24-19 | 4494 | 100,000 |
| 07-01-19 | 4494 | 100,000 |
| 08-15-19 | 4494 | 44,269 |
| 08-27-19 | 1146 | 50,000 |
| 09-17-19 | 4494 | 100,000 |
| 10-21-19 | 4494 | 25,000 |
| 11-13-19 | 1146 | 16,332 |
| 11-18-19 | 4494 | 25,000 |
| 11-20-19 | 4494 | 15,000 |
| 12-02-19 | 4494 | 25,000 |
| 12-10-19 | 4494 | 15,000 |
| 12-16-19 | 4494 | 40,000 |
| 12-19-19 | 4494 | 7,500 |

| | | |
|---|---|---|
| 01-09-20 | 4494 | 50,000 |
| 01-16-20 | 4494 | 21,000 |
| 02-07-20 | 4494 | 15,000 |
| | | $849,100.73 |

30.    Additionally, beginning at least as of January of 2019, and until at least August of 2020, the Oxford Defendants have paid $5,290,780.72 to American Express for charges incurred by Flagstad.  Another Flagstad Company but not a defendant herein, Channel Clarity LLC ("Channel Clarity"), paid $625,762.87 to American Express for charges incurred by Flagstad. These expenses, in whole or in part, are not legitimate business expenses. The payments were made by the electronic transfer of funds.

31.    Flagstad orchestrated the theft of millions in funds in order to transfer cash between the Defendants in furtherance of the Enterprise. It was and is important to Flagstad and the Defendants that they each independently maintain an image of financial success in order to be able to continue to defraud other investors, private equity firms, and banks in furtherance of the Enterprise.

32.    The Defendants have demonstrated an open-ended series of conduct that is ongoing.  The Enterprise's modus operandi is to fraudulently obtain funds through the guise of legitimate companies and transfer funds between the companies all for the purpose of enriching Flagstad.  For example, Channel Clarity is a business that ostensibly provides an internet platform for people seeking employment.  Channel Clarity has and continues to solicit investor funds from individuals, private equity firms, and family offices.

33.    The Trust also invested over $200,000 into Channel Clarity in response and in reliance upon false representations made by Flagstad.  Flagstad represented that the Trust's investment would be used to capitalize Channel Clarity.  The Trust has received no monies back

from its investment in Channel Clarity. Unbeknownst to the Trust until October 2020, the Trust and other investors have been defrauded and are continuing to be defrauded in one or more of the following ways: Channel Clarity has paid $625,762.87 in illegitimate American Express bills for Flagstad, and Channel Clarity has transferred $69,967.22 to Flagstad directly.

34.     Each of the Defendants have and continue to engage in other fraudulent and criminal conduct in furtherance of the Enterprise to wit:

### BANK FRAUD

### The Small Business Association

35.     The United States Small Business Administration ("SBA") was and is an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The SBA's mission is to maintain and strengthen the nation's economy through enabling the establishment and viability of small businesses and assisting in the community economic recovery after disasters.

36.     As part of this effort, the SBA enabled and provides for loans through banks, credit unions, and other lenders. These loans have government backed guarantees.

### The Paycheck Protection Program

37.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in March 2020 and is designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects the COVID-19 pandemic has caused. One source of relief the CARES Act provides is the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized up to $310 billion in PPP funding.

-11-

38.     In order to obtain a PPP loan, a business must submit a PPP loan application (SBA Form 2483), which is signed by an authorized business representative.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and to make certain affirmative certifications regarding its eligibility.  In the application, the small business's authorized representative must also provide, among other things, the business's: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the business's eligibility and the amount of money it may receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

39.     A PPP loan application must be processed by a participating lending financial institution. If a PPP loan application is approved by the participating financial institution, that institution funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Participating financial institutions require that the information provided in PPP loan applications be truthful, including information about the applicant business's employees and payroll expenses, which is material to the financial institutions' approval and the PPP loan terms.

40.     Information from the application, including the borrower's information, the total loan amount, and the listed number of employees, is transmitted by the lending financial institution to the SBA during loan processing.

41.     The business must use PPP loan proceeds for certain permissible expenses payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these items within a designated time period (usually within twenty-four weeks of receiving the proceeds) and uses at least 60% of the PPP loan proceeds for payroll expenses.

## Oxford Marketing's Fraudulent PPP Loan Application

42.     Oxford Marketing is a health care marketing company.

43.     On April 4, 2020, just days before this lawsuit was first filed, Oxford Marketing submitted a Borrower Application Form ("Application") for a $292,650 PPP loan to Wintrust Financial ("Wintrust").

44.     Wintrust is a federally insured financial institution with the Federal Deposit Insurance Corporation ("FDIC") and based in Rosemont, Illinois.

45.     The Oxford Marketing Application represented that it had 56 employees and an average monthly payroll of $117,060.

46.     The Oxford Marketing Application represented that the purpose of the loan was for payroll.

47.     The Application identified Flagstad as a 50% owner in Oxford Marketing. The other 50% owner in Oxford Marketing is an individual.

48.     The primary contact in the Application was identified as Flagstad who could be contacted through another limited liability company, Channel Clarity, LLC, by telephone and e-mail of bflagstad@channelclarity.com.

49.     On April 17, 2020, a deposit in the amount of $292,650 with the description "Loan Proceeds SBA PPP" was made in Oxford Marketing's Wintrust account ending in 4494.

50.     Oxford Marketing in April 2020 did not have 56 employees and it does not today. In fact, at the time of the loan application, and receipt of SBA funds from Wintrust, Oxford Marketing had less than fifteen employees.

51.     Oxford Marketing used the proceeds from the PPP loan for purposes other than payroll expenses.

52. Flagstad signed the Application as Oxford Marketing's Authorized Representative in order to fraudulently obtain the SBA funds.

53. Flagstad further identified himself in the Application as the CEO for Oxford Marketing.

54. As the Oxford Marketing Authorized Representative, Flagstad certified that the Oxford Marketing Application was truthful in all respects, and among other things, that he had made no false statements on behalf of Oxford Marketing to obtain a guaranteed loan from the SBA through Wintrust.

55. It was the purpose of Oxford Marketing in submitting a fraudulent PPP loan application to Wintrust, where it represented that Oxford Marketing was a fully functional business with 56 employees, and that the SBA loan proceeds were to be used for payroll, to obtain monies in furtherance of the Defendants unlawful Enterprise.

56. Oxford Marketing fraudulently obtained $292,650 in SBA loan proceeds from Wintrust in furtherance of the Enterprise's goal to enrich Flagstad.

57. Oxford Marketing and Flagstad's recent actions violate the following federal criminal statutes: 18 U.S.C. § 1341 (mail fraud), §1343 (wire fraud), §1344 (bank fraud), §1001 & §1041 (false statements).

### Oxford Tax's Fraudulent PPP Loan Application

58. On April 4, 2020, Oxford Tax submitted a Borrower Application Form ("Application") for a $350,755 PPP loan to Wintrust.

59. Wintrust is a federally insured financial institution with the Federal Deposit Insurance Corporation and based in Rosemont, Illinois

60.     The Oxford Tax Application represented that it had 50 employees and an average monthly payroll of $140,302.

61.     The Oxford Tax Application represented that the purpose of the loan was for payroll.

62.     The Application identified Flagstad as a 90% owner of Oxford Tax.

63.     The primary contact in the Application was identified as Flagstad who could be contacted through another limited liability company, Channel Clarity, LLC, by telephone and e-mail of bflagstad@channelclarity.com.

64.     In or around April 2020, a deposit in the amount of $350,755 with the description "Loan Proceeds SBA PPP" was made in Oxford Tax's Wintrust account.

65.     In April 2020, Oxford Tax did not have 50 employees and does not today.  In fact, at the time of the loan application, and receipt of SBA funds from Wintrust, Oxford Tax  had less than fifteen employees.

66.     Oxford Tax used the proceeds from the PPP loan for purposes other than payroll expenses.

67.     Flagstad signed the Application as Oxford Tax's Authorized Representative in order for Oxford Tax to obtain the SBA funds.

68.     Flagstad further identified himself in the Application as the CEO of Oxford Tax.

69.     As the Oxford Tax Authorized Representative, Flagstad certified that the Application was truthful in all respects, and among other things, that he had made no false statements on behalf of Oxford Tax to obtain a guaranteed loan from the SBA through Wintrust.

70.     It was the purpose of Oxford Tax in submitting a  fraudulent PPP loan application to Wintrust, where it represented that Oxford Tax was a fully functional business with 50

-15-

employees, and that the SBA loan proceeds were to be used for payroll, to obtain monies in furtherance of the Defendants unlawful enterprise.

71.   Oxford Tax fraudulently obtained $350,755 in SBA loan proceeds from Wintrust in furtherance of the Enterprise's goal to enrich Flagstad.

72.   Oxford Tax and Flagstad's actions violate the following federal criminal statutes:

18 U.S.C. § 1341 (mail fraud), §1343 (wire fraud), §1344 (bank fraud), §1001 & §1041 (false statements).

## THE ENTERPRISE DEFENDANTS

### Brock Flagstad

73.   The Enterprise is directed by Flagstad.

74.   At Flagstad's direction, the Defendants have engaged and continue to engage in a scheme to defraud investors, banks, and the government.

75.   Flagstad has a rapacious personal need for cash to support his lavish lifestyle of private jets and expensive cars. Flagstad's cash needs exceeded any compensation he received from Folding Light. In furtherance of the Enterprise, Flagstad has systematically directed the Defendants to fraudulently obtain millions of dollars in cash from the Trust, other investors, banks, and the government.

76.   Flagstad most recently may have created phony invoices and/or expense records to substantiate the hundreds of thousands of dollars he transferred from Folding Light to Oxford. Since Flagstad retains complete control over Folding Light's books and records, the Trust has little to no understanding of the Company's financial affairs. And despite the Trust's repeated requests to review Folding Light's books and records, Flagstad has refused to produce them and/or to provide an accounting of the use of Folding Light assets.

77.     The Trust's $2 million dollar investment in Folding Light was transferred to the Defendants in furtherance of the Enterprise. Flagstad breached his fiduciary duty to Folding Light and the Trust when he directed the transfer of assets from Folding Light to Oxford Media and other Defendants.

78.     Over the last two years, Flagstad has paid over $5 million dollars in American Express bills with cash proceeds from the Enterprise. He is continuing to engage in mail fraud, wire fraud, and bank fraud in order to obtain money for the Enterprise.

79.     Flagstad has further engaged in offshore banking, and upon information and belief, has done so to secrete fraudulently obtained funds from the Trust, other investors, and banks.  Flagstad obtained letters of reference from a bank officer at a federally insured institution and an attorney in order to establish offshore bank accounts.  The Plaintiffs have not had an opportunity to engage in full discovery on this allegation and it is therefore made upon information and belief.

### Oxford Marketing Partners

80.     Oxford Marketing is an advertising company that markets and sells health insurance products through the internet and telephone.

81.     Oxford Marketing directed and participated, directly and indirectly, in the illegal and criminal activities of the Enterprise, including fraudulently obtaining funds from the Trust, as well as other investors, and engaged in bank fraud to obtain monies from Wintrust.

82.     In late 2018, Oxford Marketing received a loan in the amount of $200,000 from Folding Light.  Flagstad represented to the Trust as a member in Folding Light that the loan was for Oxford Marketing ongoing operations. In fact it was obtained in furtherance of the Enterprise.

83.     On April 4, 2020, Oxford Marketing fraudulently obtained another loan in the amount of $292,650. This time Oxford Marketing lied to a federally insured financial institution, Wintrust, in order to obtain an SBA Payroll Protection Plan loan.

84.     Oxford Marketing used the proceeds from the PPP loan for purposes other than payroll expenses.

85.     Oxford Marketing fraudulently obtained the PPP loan proceeds on behalf of the Enterprise.

86.     In or about August 2020, Oxford Marketing transferred money back into Folding Light in order to pay legal fees for ongoing litigation as more further described in paragraph 20.

87.     Oxford Marketing participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express.

## Oxford Tax Partners

88.     Oxford Tax provides consumer financial advice and assistance related to tax obligations.

89.     Oxford Tax directed and participated, directly and indirectly, in the illegal activities of the Enterprise, including fraudulently obtaining funds from the Trust, as well as other investors, and engaged in bank fraud to obtain monies from Wintrust.

90.     On or around April 4, 2020, Oxford Tax fraudulently obtained a PPP loan in the amount of $350,755.

91.     Oxford Tax used the proceeds from the PPP loan for purposes other than payroll expenses as was represented in the loan application.

92.     Oxford Tax fraudulently obtained these loan proceeds for the benefit of and in furtherance of the Enterprise.

93.     Oxford Tax participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express.

## Oxford Media Group

94.     Oxford Media provides internet advertising and marketing services.

95.     Oxford Media directed and participated, directly and indirectly, in the illegal activities of the Enterprise, including fraudulently obtaining funds from the Trust, as well as other investors.

96.     Oxford Media participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express.

## Oxford FG

97.     Oxford FG is a management company for the Oxford Defendants.

98.     Oxford FG directed and participated, directly and indirectly, in the illegal activities of the Enterprise, including fraudulently obtaining funds from the Trust, as well as other investors.

99.     Oxford FG participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express.

## Oxford GP

100.    Oxford GP is a management company for the Oxford Defendants.

101.    Oxford GP directed and participated, directly and indirectly, in the illegal activities of the Enterprise, including fraudulently obtaining funds from the Trust, as well as other investors.

-19-

102.     Oxford GP participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express.

**Financial Freedom Advisors**

103.     Financial Freedom Advisors provides consumer finance advice.

104.     Financial Freedom Advisors directed and participated, directly and indirectly, in the illegal activities of the Enterprise, including fraudulently obtaining funds from the Trust and other investors.

105.     Between June 1 and July 24, 2018, FFA received funds from Folding Light in the amount of at least $340,000. FFA had no legitimate business relationship with Folding Light. The funds FFA received from Folding Light have not been returned and have been transferred to the other Defendants in furtherance of the Enterprise.

106.     FFA participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express.

**Cloverpoint Partners**

107.     Cloverpoint is an investment company that holds shares in Folding Light.

108.     Cloverpoint participated, directly and indirectly, in the illegal activities of the Enterprise, including assisting directly or indirectly in fraudulently obtaining funds from the Trust and coordinating the concealing and transfer of funds between the Defendants.

109.      In order to facilitate and conceal the scheme to defraud investors and banks, the Defendants transferred assets received from investors and banks between themselves and Flagstad in furtherance of the ongoing fraudulent Enterprise.

110.    Cloverpoint has further engaged in offshore banking, and upon information and belief, has done so to secrete fraudulently obtained funds from the Trust, other investors, and banks.  The Plaintiffs have not had an opportunity to engage in full discovery on this allegation and it is therefore made upon information and belief.

111.    Cloverpoint participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express.

**COUNT I**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

112.    Plaintiffs reallege paragraphs 1 through 111 as though fully set forth herein.

113.    The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it unlawful "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affected, interstate or foreign commerce." 18 U.S.C. § 1962(c).

114.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

115.    The RICO enterprise is an association in fact enterprise, within the meaning of 18 U.S.C. § 1961(4) which includes Oxford Marketing, Oxford Media, Oxford Tax, Oxford FG, Oxford GP, FFA, Cloverpoint, and Flagstad. Their association encompassed an enterprise for the commission of at least two predicate acts of racketeering activity enumerated in 18 U.S.C. § 1961(1)(B) (the "Enterprise").

116.    The Enterprise has a common purpose: To engage in financial fraud including but not limited to, 18 U.S.C. § 1341 (mail fraud), §1343 (wire fraud), §1344 (bank fraud), §1001 &

§1041 (false statements) and §2314 (interstate transportation of stolen property), in order to enrich Flagstad. The Enterprise has been ongoing for several years and is dependent upon its members to carry out its illegal purpose. It is an ascertainable and ongoing structure separate and apart from that inherent in the pattern of racketeering activity that the Defendants are engaged in. Oxford Marketing, Oxford Media, Oxford Tax, Oxford FG, Oxford GP, FFA, Cloverpoint, and Flagstad are persons distinct from the Enterprise.

117. To accomplish the goal of the Enterprise, each Defendant engaged in financial fraud to obtain funds illegally, either directly or indirectly, from investors like the Trust who invested in Folding Light, or banks such as Wintrust who in reliance upon fraudulent loan applications, disbursed $643,405 in PPP loans to Oxford Marketing and Oxford Tax, the funds of which were transferred between the Defendants.

118. At all relevant times, each Defendant was associated with the Enterprise, and exerted control over the Enterprise and/or participated directly or indirectly in the operation and management of the affairs of the Enterprise.

119. The Enterprise engaged in and affected interstate commerce through the use of mails and wires to communicate through telephone, e-mail and to fraudulently obtain money from investors, banks and to transfer assets and funds between persons in the Enterprise.

120. The Defendants committed several acts that constituted an unlawful scheme or artifice of racketeering intended to defraud, or to obtain money or property through false or fraudulent pretenses, representations, or promises, in violation of 18 U.S.C. § 1341 (mail fraud), §1343 (wire fraud), §1344 (bank fraud), §1001 & §1041 (false statements) and §2314 (interstate transportation of stolen property).

121.     The Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §1341 (mail fraud), §1343 (wire fraud), §1344 (bank fraud), §1001 & 1014 (false statements) and §2314 (interstate transportation of stolen property), as described herein.

122.     The mails and wires were used on numerous occasions in furtherance of the foregoing scheme or artifice against the Plaintiffs and others.

123.     To accomplish the goal of the Enterprise as alleged herein, Oxford Marketing, Oxford Media, Oxford Tax, Oxford FG, Oxford GP, FFA, Cloverpoint, and Flagstad did the following: communicated with one another through the use of electronic mail and/or telephone in order to execute cash transfers and "loans" between Folding Light, Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint;  continued to fraudulently solicit investors like the Trust; and continued to fraudulently obtain loans from banks such as Wintrust, with the agreed shared goal of financially enriching Flagstad. Information relating to additional victims is exclusively within the Defendants' control.

124.     Oxford Marketing, Oxford Media, Oxford Tax, Oxford FG, Oxford GP, FFA, Cloverpoint, and Flagstad further communicated with one another, PNC Bank, Wintrust, American Express, as well as other financial institutions, through the use of electronic mail, internet banking platforms, and/or telephone in order to fraudulently apply for bank loans, solicit investors, effectuate cash transfers, create fraudulent "loans" by and between Oxford Marketing, Oxford Media, Oxford Tax, Oxford FG, Oxford GP, FFA, Cloverpoint, and Flagstad. Information relating to additional victims of the Enterprise is exclusively within the Defendants' control.

125.    Folding Light received from the Trust $2,000,000 in funds intended for use as trading capital and not to be used for business operating expenses. Flagstad, over the course of the past year and a half has directed the transfer of the funds Folding Light received from the Trust to himself personally, Oxford Marketing, and FFA, and other Defendants in furtherance of the Enterprise.

126.    The Defendants' repeated use of the wires from 2019 to the present, in furtherance of the foregoing schemes or artifices, constituted acts of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

127.    The Defendants engaged in an unlawful pattern of racketeering activity to defraud the Plaintiffs, other investors, banks such as Wintrust, the government, and other unknown victims.

128.    By virtue of these violations of 18 U.S.C. § 1962(c), the Defendants are liable to the Plaintiffs for three times the damages they have sustained as a result of the Defendants' conduct, plus the costs of this suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, the Trust prays for the following relief against Defendants Flagstad, Oxford Marketing, Oxford Media, Oxford Tax, Oxford FG, Oxford GP, FFA, and Cloverpoint:

a.    Award the Plaintiffs damages in an amount in excess of $2,000,000;

b.    Pursuant to 18 U.S.C. § 1964(c), award the Plaintiffs three times the amount of actual damages incurred as a result of the Defendants' conduct;

c.    Award costs of litigation including; but not limited to, attorneys' fees, court costs and expert costs;

    d.     Award prejudgment interest on any monetary awards to the Plaintiffs; and

    e.     For such other and further relief the court deems is just.

**COUNT II**
**(Conspiracy to Violate Section 1962(c) of RICO, 18 U.S.C. § 1962(d))**

129.    Plaintiffs reallege paragraphs 1 through 128 as though fully set forth herein.

130.    RICO makes it unlawful for any person to conspire to violate subsection (c) of Title 18, Section 1962. *See* 18 U.S.C. § 1962(d).

131.    Defendants collectively joined in agreement and conspired with one another to commit at least two predicate acts of racketeering activity enumerated in 18 U.S.C. § 1961(1)(B), in violation of 18 U.S.C. § 1962(d).

132.    To accomplish the goal of the Enterprise, each Defendant agreed to transfer funds to Flagstad and/or each other.  Each Defendant also agreed to engage in financial fraud to obtain funds illegally, either directly or indirectly, from investors like the Trust who invested in Folding Light, or banks such as Wintrust who in reliance upon fraudulent loan applications, disbursed $643,405 in PPP loans to Oxford Marketing and Oxford Tax.

133.    Each Defendant knowingly agreed to perform services of a kind which facilitate the Enterprise, by, *inter alia*, fraudulently obtaining investor funds, applying for and obtaining bank loans, and funding and paying for illegitimate Flagstad business expenses.

134.    By virtue of their violation of 18 U.S.C. § 1962(d), the Defendants are liable to the Plaintiffs for three times the damages they have sustained as a result of the Defendants' conduct, plus the costs of this suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, the Trust prays for the following relief against Defendants Flagstad, Oxford Marketing, Oxford Media, Oxford Tax, Oxford FG, Oxford GP, FFA and Cloverpoint:

    a.     Award the Plaintiffs damages in an amount in excess of $2,000,000;

    b.     Pursuant to 18 U.S.C. § 1964(c), award the Plaintiffs three times the amount of actual damages incurred as a result of the Defendants' conduct;

    c.     Award costs of litigation including; but not limited to, attorneys' fees, court costs and expert costs;

    d.     Award prejudgment interest on any monetary awards to the Plaintiffs; and

    e.     For such other and further relief the court deems is just.

## THE PENDENT STATE LAW CLAIMS

## COUNT III
### (Common Law Fraud)

135.    Plaintiffs reallege paragraphs 1 through 111 as though fully set forth herein.

136.    Folding Light received from the Trust $2,000,000 in funds intended for use as trading capital and not to be used for business operating expenses. Flagstad over the course of the past year and a half directed that Folding Light funds received from the Trust be transferred to the Defendants.

137.    At the time that Flagstad represented to the Trust that its investment would be used for Folding Light trading capital, Flagstad was soliciting funds from the Trust so he could obtain them for himself and the other Defendants. Once the Trust funds were received at Folding Light, Flagstad almost immediately directed Folding Light's bank, Wintrust, to transfer funds to the other Defendants.

138.    At the time that Flagstad made the representations to the Trust, he knew that his representations were false and that he needed the Trust's cash to support the Enterprise and his personal lavish lifestyle.

139.    Flagstad made the representations to the Trust with the intent to fraudulently obtain its money so he could use later use the Trust's funds for himself and the other Defendants.

140.    The Trust was reasonably induced by Flagstad's representations to invest funds into Folding Light and did so.

141.    Flagstad's representations and the Defendants' wrongful conduct constitute fraud.

142.    The Trust and Folding Light have incurred damages in excess of $2,000,000.

143.    The Trust and Folding Light have no adequate remedy at law.  Money damages alone will not, and cannot, compensate the Trust and Folding Light for the loss of goodwill, or the loss of business opportunities, which they will suffer as a result of the actions of these Defendants.

144.    By their conduct, Defendants have demonstrated their willingness to continue to engage in continuous fraudulent acts. It is clear that the injury to the Trust and Folding Light is immediate and irreparable.

145.    The Trust and Folding Light have demonstrated that these Defendants have, and unless restrained will continue to, engage in conduct which is alleged herein.  There is a likelihood that the Trust and Folding Light will prevail on the merits of this action.

146.    Should the Court grant interlocutory injunctive relief to the Trust and Folding Light, the burden on these Defendants will be slight compared to the injury to the Trust and Folding Light if it is not granted.  No injury to these Defendants will result from an order which requires these Defendants to comport their actions to the law.

147.    The granting of an injunction will not disserve the public interest.  Indeed, injunctive relief would protect against the continuing fraud that Flagstad, the Defendants and the Enterprise continue to engage in .

148.     Whereas here, Flagstad and the Defendants are business operations that are permeated by fraud, the Trust and Folding Light have made the requisite showing that assets will be dissipated during the pendency of the proceedings unless Defendants' assets are frozen and a receiver appointed to marshal and protect them.

## COUNT IV
### (Conversion/Theft)

149.     Plaintiffs reallege paragraphs 1 through 111 as though fully set forth herein.

150.     Folding Light received from the Trust $2,000,000 in funds for use as trading capital and which were not to be used for Folding Light business operations.  Flagstad and the other Defendants had no legal right to take or use Folding Light funds the Trust had invested in Folding Light.

151.     Beginning in May 2018 Flagstad, and the other Defendants began taking Folding Light cash into their accounts as Flagstad directed in furtherance of the Enterprise.  This conduct occurred without Folding Light or the Trust's consent and in furtherance of the Enterprise and to Folding Light and the Trust's detriment.

152.     The wrongful cash transfers amount to at least $849,000.  The illegal cash transfers were made without the consent of Folding Light Members or the Trust.

153.     The cash transfers constituted the conversion of funds from Folding Light.  None of the funds converted have been repaid to Folding Light or returned to the Trust.

154.     Defendants continue to possess, control, or have wrongfully benefitted from their conversion of Folding Light cash and funds the Trust invested.

155.     Defendants wrongfully assumed control and possession of Folding Light cash from its bank accounts.

156. The Trust has made demand upon Folding Light for the return of the cash stolen from it.

157. Despite the Trust's demands for payment, the Defendants have refused and continue to refuse to return the cash converted from Folding Light.

158. The Trust and Folding Light have no adequate remedy at law. Money damages alone will not, and cannot, compensate the Trust and Folding Light for the loss of goodwill, or the loss of business opportunities, which they will suffer as a result of the actions of these Defendants.

159. By their conduct, Defendants have demonstrated their willingness to continue to engage in the conversion and theft of Folding Light assets. It is clear that the injury to the Trust and Folding Light is immediate and irreparable.

160. The Trust and Folding Light have demonstrated that these Defendants have, and unless restrained will continue to, engage in conduct which is alleged herein. There is a likelihood that the Trust and Folding Light will prevail on the merits of this action.

161. Should the Court grant interlocutory injunctive relief to the Trust and Folding Light, the burden on these Defendants will be slight compared to the injury to the Trust and Folding Light if it is not granted. No injury to these Defendants will result from an order which requires these Defendants to comport their actions to the law.

162. The granting of an injunction will not disserve the public interest. Indeed, injunctive relief would protect against the continuing fraud that Flagstad, the Defendants and the Enterprise continues to engage in.

163. Whereas here, the Defendant businesses are permeated by fraud, the Trust and Folding Light have made the requisite showing that assets will be dissipated during the pendency

of the proceedings unless Defendants' assets are frozen and a receiver appointed to marshal and protect them.

## COUNT V
### (Breach of Fiduciary Duty)

164.     Plaintiffs reallege paragraphs 1 through 111 as though fully set forth herein.

165.     At all times relevant hereto, Flagstad was a Folding Light Member and acted as its Lead Manager and was an agent for his principal Folding Light.

166.     As an agent for Folding Light and as its Lead Member, Flagstad had a fiduciary duty of loyalty and good faith and is required to behave in a manner consistent with and solely with Folding Light and the Trust's best interest.

167.     Flagstad was further required to preserve and promote Folding Light's business and to preserve its assets for Folding Light's benefit and its members, including the Trust.

168.     Flagstad intentionally and willfully breached his fiduciary duty owed to Folding Light and the Trust by embezzling cash from Folding Light and transferring it to himself, and the other Defendants.

169.     Flagstad further breached his fiduciary duty owed to the Trust and Folding Light by otherwise generally in mismanaging Folding Light assets and by the actions complained of above.

170.     As a direct and proximate result of one or more of Flagstad's foregoing wrongful acts or omissions, Flagstad has caused and is causing irreparable harm, as well as substantial monetary damages to the Trust and Folding Light in an amount of at least $2,000,000. The Trust and Folding Light have no adequate remedy at law.  Money damages alone will not, and cannot, compensate the Trust and Folding Light for the loss of goodwill, or the loss of business opportunities, which they will suffer as a result of Flagstad's illegal actions.

-30-

## COUNT VI
### (Breach of Contract)

171.    Plaintiffs reallege paragraphs 1 through 111 as though fully set forth herein.

172.    The Trust acquired an interest in Folding Light pursuant to the Folding Light Limited Liability Agreement effective as of February 1, 2018 ("the Agreement") and attached hereto as Exhibit A.

173.    The Trust has fully performed all obligations under the Agreement.

174.    Pursuant to the terms of the Agreement, among other things, Flagstad was to act in the best interest of Folding Light and its Members. Flagstad as a Member and Lead Manager furthermore had fiduciary duties owed to Folding Light and its Members, including the Trust.

175.    The Agreement further requires unanimous written consent of the Members before the Company or its Mangers could dilute a Members' interest as Flagstad did here with the outright theft of Folding Light cash.  The Agreement also requires that Flagstad as a Folding Light Manager and its Lead Manager keep or cause to be kept complete and accurate books and records of the Company along with supporting documentation for transactions with respect to the conduct of the Company's business. Flagstad materially breached the Agreement in failing to keep or have kept accurate books and records as the Agreement requires.

176.    Flagstad further materially breached the Agreement in acquiring real and/or personal property through converted Folding Light cash wrongfully transferred to either himself or the other Defendants.

177.    Flagstad's conversion of Folding Light cash constitutes a material breach of the Agreement.

178.     The Trust has made demand upon Flagstad for the return of the cash stolen from Folding Light. The Trust has further made a demand upon Flagstad for an accounting and to inspect the books and records of Folding Light which has he has failed or refused to provide.

179.     Despite the Trust's demands for payment, Flagstad has refused and continues to refuse to return the cash converted from Folding Light.

180.     The Agreement provides that in the event of a breach or even threatened breach of one or more provisions of the Agreement, that the party who is or may be injured shall be entitled to the following preliminary and permanent injunctive relief (i) restraining and enjoining any act which would constitute a breach, (ii) compelling the performance of any obligation under the Agreement that if not performed would constitute a breach of the Agreement, and such relief may be obtained without the showing of actual irreparable harm and no bond or security shall need to be furnished.

## COUNT VII
### (Civil Conspiracy)

181.     Plaintiffs reallege paragraphs 1 through 111 as though fully set forth herein.

182.     The Defendants acted in concert, and conspired with each other to violate the common law as alleged herein in the preceding Counts III, IV, V and VI. Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint were aware of the conspiracy and knowingly participated therein. Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint participated in accepting and wrongfully transferring funds from Folding Light in coordination with Flagstad. The scheme Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint participated in led to the conversion of Folding Light trading capital and which the Trust had invested in Folding Light. Flagstad, Oxford Marketing, Oxford Tax, Oxford Media,

Oxford FG, Oxford GP, FFA and Cloverpoint acted in concert to commit illegal acts, including but without limitation, the claims alleged herein.

183. Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint had a meeting of the minds on the course of action as alleged in the preceding Counts III, IV, V and VI, including the conversion, and wrongful use of Folding Light cash the Trust had provided through its investment.

184. The Trust's damages, including but not limited to the diminution of the value of Folding Light and loss of business opportunities, cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief. Furthermore, the Agreement permits and allows for injunctive relief under these circumstances of a material breach as Flagstad has done herein.

185. Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint's actions will continue to cause harm to Folding Light and the Trust unless restrained.

186. Should this court grant injunctive relief to the Trust and Folding Light, the burden on the Defendants would be slight compared to the injury to the Trust and Folding Light if it was not granted. No injury to the Defendants would result from an order requiring them to comport their actions under the law. There is a likelihood that the Trust and Folding Light will prevail on the merits.

187. The granting of an injunction will not disserve the public interest. Indeed, granting the injunction would ensure that the Defendants are not able to injure others with their continued unlawful conduct. And, the Agreement provides for the issuance of an injunction whereas here Flagstad has materially breached the Agreement.

### RELIEF REQUESTED COUNTS III – VII

WHEREFORE, the Trust and Folding Light pray for the following relief against Defendants Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint:

a. Entry of a preliminary and permanent injunction against these Defendants, and each of them, from engaging in acts and practices in violation of the law;

b. Entry of a preliminary and permanent injunction against these Defendants, and each of them, enjoining and restraining them from destroying or disposing of any books, records, or accounts or of any property, whether real, personal, or mixed;

c. Entry of a preliminary and permanent injunction enjoining and restraining any Defendant or person acting on their behalf, from withdrawing transferring or disposing of any property owned by these Defendants and each of them whether real, personal, or mixed;

d. Entry of an order appointing a receiver with the power to sue for, collect, receive and take into his possession all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, records, documents, papers, choses in action, bills, notes and property of every description, which were derived by means of the illegal practices described above;

e. Entry of a judgment in favor of the Trust and Folding Light against the above Defendants, and each of them, for compensatory damages in an amount to be proven at trial, but which is not less than $2 million;

f. An award of punitive damages in an amount to be proven at trial;

g.     Entry of an order freezing the assets of these Defendants and ordering the appointment of a receiver over Defendants' assets;

h.     The imposition of a constructive trust on these Defendants on all monies or property obtained by or through their wrongful conduct as alleged herein;

i.      An order prohibiting the Defendants from filing a petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* without prior permission from this Court;

j.      An order awarding the Trust its costs and attorney's fees; and

k.     Such further and additional relief as the Court may deem appropriate.

## COUNT VIII
### (Accounting)

188.    Plaintiffs reallege paragraphs 1 through 111 as though fully set forth herein.

189.    Flagstad's conduct as alleged herein constitutes fraud, conversion and breaches of his respective fiduciary duties to Folding Light and its members, including the Trust.

190.    Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint, through their actions and outright theft of Folding Light cash have funneled assets to various persons and entities unknown to the Trust.

191.    The Trust has made a demand for an accounting from Flagstad as Folding Light's Lead Manager and the controlling Member of Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint, and he has failed or otherwise refused to provide one.

192.    The Trust is entitled to an accounting because of Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint's conversion of

Folding Light assets, and fraud, conversion and breach of fiduciary duties as alleged herein. The accounting requested should be conducted in equity because:

- The Trust has no adequate remedy at law for an accounting;

- The accounting would be complex and intricate as Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint have engaged in numerous complex scams in order to steal Folding Light assets and the assets of others; and

- The total amounts due from Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint are unknown to the Trust because the individual Defendants have exclusive knowledge of the accounts and cash transfers made from Folding Light and in and out of Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint. Only Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint have the records necessary to conduct an accounting that would reveal how and when assets were taken from Folding Light and transferred by and between the Defendants.

WHEREFORE, for all the forgoing reasons, Plaintiffs respectfully request the following relief:

a. An order compelling Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint to account for all transactions with Folding Light;

b. A judgment entered in favor of the Trust and Folding Light and against Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and

Cloverpoint for all loses sustained resulting from the Defendants' fraud, conversion, and Flagstad's breach of fiduciary duties;

c.    An order awarding the Trust and Folding Light its costs and attorney's fees incurred in this action; and

d.    Such further and additional relief as the Court may deem appropriate.

Dated:  November 9, 2020             Respectfully submitted,

THE JAMES STREIBICH REVOCABLE TRUST
OF 2002, an Illinois Trust, individually, and
Derivatively, on behalf of FOLDING LIGHT, LLC,
a Delaware Limited Liability Company


By:  */s William K. Kane*
One of Its Attorneys
William K. Kane, Esq. (6194466)
David M. Poell, Esq.(6302765)
SHEPPARD MULLIN RICHTER & HAMPTON LLP
Three First National Plaza
70 West Madison Street, 48th floor
Chicago, Illinois 60602
Telephone:  312.499.6300
Facsimile:  312.499.6301
wkane@sheppardmullin.com
dpoell@sheppardmullin.com


***Counsel for Plaintiffs,*** The James Streibich
Revocable Trust of 2002, an Illinois Trust,
individually, and derivatively, on behalf of Folding
Light, LLC, a Delaware Limited Liability
Company.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of November, 2020, I electronically filed the foregoing **AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND APPOINTMENT OF A RECEIVER** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ William K. Kane
William K. Kane